**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:24-cv-00219-MR**

| | |
|---|---|
| **ANTONIO DUPREE JEFFERSON,** )<br>)<br>) | |
| **Plaintiff,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| ) | |
| **T.J. BOYKINS, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | |

**THIS MATTER** comes before the Court on Defendants' Motion for
Summary Judgment [Doc. 46], Plaintiff's "Motion Opposing Defendants
Motion for Summary Judgment"[1] [Doc. 54], and Defendants' Reply [Doc. 55].

I.    **PROCEDURAL BACKGROUND**

Pro se Plaintiff Antonio Dupree Jefferson ("Plaintiff") is a prisoner of
the State of North Carolina currently incarcerated at the Marion Correctional
Institution in Marion, North Carolina.  On or about August 19, 2024, he filed
this lawsuit pursuant to 42 U.S.C. § 1983 based on the alleged use of

_____

[1] The Court will construe this purported motion, which was filed nearly two months after
the dispositive motions deadline, as Plaintiff's response to Defendants' summary
judgment motion.

excessive force by Defendants T.J. Boykins, Joey E. Brandle, D.S. Chapman, FNU Steele, FNU Smith, and John Does 1 and 2 at the Rutherford County Detention Center (the "Jail") on August 22, 2021. [Doc. 1; Doc. 1-2 at 1 (postmark)]. Plaintiff seeks monetary relief only, including punitive damages. [Id. at 9].

On September 3, 2024, the Court allowed Plaintiff's individual capacity Fourteenth Amendment excessive force claims against all Defendants to pass initial review. [Doc. 5]. The Court dismissed Plaintiff's official capacity claims and claim based on the alleged denial of medical care for his failure to state a claim for relief. [Id.]. On May 23, 2024, the Court dismissed Defendants John Doe 1 and John Doe 2 for Plaintiff's failure to show cause for his failure to timely identify and submit completed summonses for service of process on these Defendants. [Docs. 19, 22]. Defendants answered Plaintiff's Complaint and Defendants Steele and Boykins asserted counterclaims against the Plaintiff for battery. [Doc. 18].

On November 5, 2025, Defendants moved for summary judgment. [Doc. 46]. Defendants argue that summary judgment should be granted as to all Defendants because Plaintiff failed to exhaust his administrative remedies before filing suit and as to Defendants Boykins, Brandle, Chapman, and Smith because they did not violate Plaintiff's Fourteenth

Amendment rights.[2]  [Doc. 47].  In support of their summary judgment motion, Defendants submitted a brief; Declarations of Counsel, Defendant Boykins, and Major Jamie Keever; excerpts from Plaintiff's deposition in this matter; Plaintiff's Jail booking records; the relevant Jail grievance policy; a blank grievance form; and video footage of some of the relevant events.[3]  [Docs. 47, 47-1 to 47-4, 48-49].

Thereafter, the Court entered an order in accordance with <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court.  [Doc. 51].

In opposition to Defendants' motion, Plaintiff filed a brief; his own Declaration; the full transcript of his deposition; Defendants' discovery

---

[2] Defendants Steele and Boykin stipulate to the dismissal of their counterclaims if the Court dismisses Plaintiff's Complaint.  [Doc. 47 at 2].

[3] Defendants submit the body worn camera ("BWC") footage of Deputy Sheriff Seth Watkins, which captured most of the second and third uses of force at issue and which the Court hereinafter cites as "BWC."  [<u>See</u> Doc. 47-3 at ¶ 6].  The Plaintiff contends that he has viewed additional footage of the incident in relation to a criminal charge brought against him for his alleged conduct during the incident.  [Doc. 54-3 at 3, 29; <u>see</u> Doc. 54-3 at 26, 28, 34, 36-37; Doc. 42 at 2].  Plaintiff also contends that Defendants have presented a "tampered, fabricated" version of the footage to the Court, [Doc. 54-3 at 3], and that there are a total of nine (9) cameras on the first and second floor that "capture anything that takes place [in] that pod," [<u>Id.</u> at 52, 57 (describing the location of the camera where the third use of force occurred)].  Plaintiff, however, does not present this footage to the Court and it was not the subject of any motion to compel in this matter.  As such, the Court can only consider what is depicted in the footage included in the forecast of evidence here.

responses; a July 31, 2024 grievance Plaintiff submitted to North Carolina Department of Adult Correction (NCDAC) officials regarding the incident; the Jail Use of Force Policy; and a marked-up copy of Boykin's Declaration. [Docs. 54, 54-1 to 54-5].  Defendants replied.  [Doc. 55].

This matter is now ripe for adjudication.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

4

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 174, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a

'genuine' dispute as to those facts."   <u>Scott v. Harris</u>, 550 U.S. 372, 380

(2007).  As the Supreme Court has emphasized,

> "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts ….  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986).   When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

<u>Scott</u>, 550 U.S. at 380.  To be sure, "at the summary judgment stage, video

evidence can only discredit a nonmovant's factual assertions if the video

'blatantly' contradicts the nonmovant's position."   <u>Simmons v. Whitaker</u>, 106

F.4th 379, 385 (4th Cir. 2024) (citing <u>Iko v. Shreve</u>, 535 F.3d 225, 230 (4th

Cir. 2008)).

## III.   FACTUAL BACKGROUND

The relevant forecast of evidence, in the light most favorable to the

non-movant, shows the following.

Plaintiff was booked at the Jail on August 17, 2021. [Doc. 54-3 at 22: Pltf's Depo.[4]]. On August 22, 2021, Plaintiff was housed in Cell 215 with another inmate. [Doc. 54-3 at 2: Pltf's Dec.]. That day, Plaintiff was told he was being moved to a different cell on the third or fourth floor. [Id.]. Plaintiff asked to speak with the Officer-in-Charge to find out why he was being moved. [Id.]. Defendant Boykins, a detention officer with the Jail, was told that Plaintiff was causing a disturbance and needed to be moved to a different floor. [Doc. 47-3 at ¶ 2: Boykin Dec.]. Hours later, Plaintiff saw "an entourage" of detention officers and Sheriff's deputies, including Defendants Brandle, Steele, Smith, and Chapman and Sheriff Deputies Seth Watkins, Caleb Buitron, Max Gee, and Ben King,[5] approaching his cell. [Doc. 54-3 at 3, 28; Doc. 47-3 at ¶ 3; Doc. 54-1 at 5]. Because of Plaintiff's history assaulting officers, extra officers were called to assist in removing the Plaintiff from his cell. [Doc. 47-3 at ¶ 3].

Defendant Steele, who weighs over 300 pounds, reached Plaintiff's cell first. [Doc. 54-3 at 3, 28-29]. Plaintiff witnessed him repeatedly pulling up his pant legs, stating "im [*sic*] ready when yal [*sic*] ready." [Id. at 3, 30].

---

[4] Plaintiff's deposition testimony is found at Doc. 54-3 at 11-115 and his Declaration at Doc. 54-3 at 2-7.

[5] Plaintiff provides that Deputies Ben King and Seth Watkins were the now dismissed Defendants Plaintiff named as John Does 1 and 2. [Doc. 54-1 at 1].

Plaintiff's cell door opened, and Defendant Steele rushed inside. [Id. at 3; see Doc. 47-3 at ¶ 4]. Defendant Steele wrapped his "massive palms" around Plaintiff's neck, slammed him headfirst into Plaintiff's steel bed, and choked him, leaving Plaintiff unable to breath. [Id. at 3, 31-32]. Plaintiff did not resist. [Id. at 3, 32]. Eventually, a deputy present had to forcefully remove Defendant Steele from the Plaintiff. Defendant Steele was asked to leave the cell. [Id. at 3, 38].

The other officers remained in Plaintiff's cell for approximately 25 minutes. [Doc. 47-3 at ¶ 4]. At some point Defendant Boykins appeared, and he and the Plaintiff went "back and forth." [Doc. 54-3 at 4, 38]. Plaintiff eventually gathered his belongings and, unrestrained, exited the cell and walked down the stairs to the first floor with Defendant Boykins and the other officers.[6] [Id. at 4; BWC]. The Plaintiff, Defendant Boykins, and the other officers proceed down the stairs to the first-floor common area. [BWC]. Shortly thereafter, Defendant Boykins walks away toward the door to Cell 114 and has an exchange with the inmate inside the cell. Plaintiff follows Defendant Boykins to the cell and informs Boykins that he wants to press charges against Defendant Steele. After some back and forth between the Plaintiff and Defendant Boykins regarding pressing charges, Plaintiff, who is

---

[6] The video footage submitted to the Court begins here.

8

irate, screams, "well let's go take 'em out [unintelligble] mother f**cker" while quickly and aggressively leaning toward Defendant Boykin. [BWC; Doc. 47-3 at ¶¶ 10-11: Boykins Dec.]. Although not clearly visibly in the footage, Defendant Boykins, who Plaintiff claims is an "ex semi pro wrestler," appears to quickly take the Plaintiff down. [BWC]. Plaintiff testified that Boykins threw his arm around the back of Plaintiff's neck and slammed Plaintiff's face into the concrete, breaking Plaintiff's tooth in half and busting his lip open. [Doc. 54-3 at 4, 50]. While Plaintiff attests that the remaining officers, including Defendants Brandle, Chapman, and Smith, and Deputies Gee, Buitron, and Watkins, "dog piled [him] long enough to put [him] in handcuffs," the video footage shows only Defendant Boykins holding the Plaintiff against the ground while one officer placed his knee on Plaintiff's leg while helping the other officers secure him in handcuffs. [BWC; Doc. 54-3 at 4, 52, 58 (admitting that the other officers "just had [their] knees on [the Plaintiff]"); Doc. 54-1 at 5]. The officers, including Defendants Boykins, Brandle, Chapman, and Smith and Deputies Gee, Buitron, and Watkins, lifted Plaintiff off the ground and walked him toward a door marked for authorized personnel only. [BWC; Doc. 54-1 at 7; Doc. 54-3 at 4].

As they walked through the door, the video time stamp reads 12:46:26 p.m. [BWC]. Shortly after they walked through the door, Detention Officer

Beth Sprouse can be seen retrieving a restraint chair. [BWC; Doc. 54-3 at 5]. At 12:46:39, as Plaintiff is struggling with Defendant Boykins, who is holding Plaintiff's left arm, and another officer, Plaintiff can be seen and heard spitting at Defendant Boykins. Defendant Boykins then reached up with his left hand and pushed Plaintiff's face away from him. A struggle ensues, which is largely obscured because of the angle of the BWC relative to the struggle. The officers present appear to be pushing Plaintiff toward the restraint chair and then pushing his head against the chair and, at 12:46:49, one officer yells, "if you're gonna spit again boy! You hear me?" and another yells "quit spittin!" More words are exchanged while the officers hold Plaintiff's head and back down against the restraint chair. [BWC].

Plaintiff attests that, after Defendant Boykins mistakenly believed that Plaintiff spat on him, Boykins repeatedly struck the Plaintiff "with brute force" in the face and neck area, [Doc. 54-3 at 5; see Doc. 54-3 at 53], and that "the other officers [including Defendants Chapman, Brandle, and Smith and Deputies Gee, Watkins, and Buitron]… all start punching [him] … in the head, face … everywhere." [Id. at 54-55, 59 (testifying that Defendant Boykins punched him three times before the other officers started hitting him), 62]. Plaintiff further attests that his "only escape" was to run a few steps and hide his face in the restraint chair where the officers continued to beat him in the

back of the head with closed fists.  [Id. at 5, 55-56, 62, 65].

There are approximately 10 seconds during which time the video footage is obscured. The audio during this time, however, presents nothing from which an inference can be drawn that Defendant Boykins or any other Defendant or officer struck the Plaintiff after Plaintiff spat on Boykins. Moreover, when the view becomes unobscured, none of the officers can be seen striking the Plaintiff while his face is against the restraint chair or otherwise.  [See BWC, 12:46:40 to 12:47:52].

At 12:47:53, with his face against the chair, Plaintiff starts repeatedly yelling "I can't breathe."  Plaintiff then complains about his hands, which are cuffed behind his back and appear unharmed in the video.  At 12:48:43, an officer starts to place a spit mask over Plaintiff's head.  After some difficulty, the mask is finally properly placed, and the Plaintiff is strapped into the restraint chair.  [BWC].

After the incident, Plaintiff was brought to Cell 310 where he was housed until he made bond on September 28, 2021.  [Doc. 54-3 at 68]. Plaintiff testified that he was not allowed out of Cell 310 for the duration of this stay at the Jail.  [Id.; Doc. 47-4 at ¶ 5: Keever Dec.; Doc. 47-4 at 11].

According to Jail grievance policy, if an inmate cannot informally resolve his grievance, he may file a written grievance on an "Inmate

Grievance" form.  [Doc. 47-4 at 43; <u>see</u> Doc. 47-4 at 47].  The written grievance is placed in a sealed envelope and addressed and delivered to the Jail Administrator or his designee without interference or delay.  [<u>Id.</u> at 43].  The grievance policy expressly covers allegations of "abuse, neglect, or mistreatment by staff or other inmates."  [<u>Id.</u> at 44].  In the grievance, the inmate should provide details of the specific conditions or incident about which the inmate complains, including the time, date, and names of detention officers involved and any witnesses.  The Jail Administrator or designee reviews the grievance and determines if it alleges a prohibited act by a detention officer.  If the grievance alleges a prohibited act, the Jail Administrator submits his findings to the Chief Deputy who decides if the Sheriff needs to order further investigation.  After an investigation of the grievance, the inmate shall receive a prompt response, which includes the findings of and action taken by the Jail Administrator.  [<u>Id.</u>].  The Jail Administrator shall maintain a log of grievances submitted and a copy of the written grievance, the investigation report, and the response on file.  [<u>Id.</u> at 45].

     According to Major Keever, prior to October 2023, inmates submitted grievances on paper grievance forms.  [Doc. 47-4 at ¶ 7: Keever Dec.].  In October 2023, inmates could either file a grievance on the Jail kiosk or by

using a paper grievance form.  [Id. at ¶ 8].  Inmates placed on lockdown do not have access to the kiosk but are allowed to file a grievance using the paper form.  [Id. at ¶ 9].  During the relevant times, the Jail isolation cells were Cells 109, 110, 209, 210, 309, 310, 409, and 410.  [Id. at ¶ 10].

After he was released on bond on September 28, 2021, Plaintiff returned to the Jail several times before he filed the instant lawsuit.  [Id. at ¶ 5].  First, he returned on November 14, 2021, through November 18, 2021, where he was housed in Cell 415.  [Doc. 47-4 at 9-11].  Then, Plaintiff returned to the Jail for two days on December 7, 2021, to December 8, 2021, where he was housed in Cell 116.  [Id. at 13-15].  Plaintiff returned to the Jail again on January 10, 2022, to February 1, 2022, where he was housed in Cell 113.  [Id. at 18-21].   Plaintiff returned to the Jail for the fourth time on March 14, 2022, to March 23, 2022.  He was housed in Cells 415 and 416 during this detention.  [Id. at 23-25].  Plaintiff returned to the Jail for the fifth time on April 19, 2022, until May 1, 2022, where he was housed in Cell 314.  [Id. at 27-30].  From February 20, 2023, to March 13, 2023, Plaintiff returned to the Jail for the sixth time.  This time, he was housed in Cell 207.  [Id. at 32-36].  Finally, Plaintiff returned to the Jail for the seventh time on August 7, 2023, to August 15, 2023, where he was housed in Cell 403.  [Id. at 38-41].   During none of his returns to the Jail did Plaintiff file a grievance

regarding any use of force incidents he alleges here.

Plaintiff testified that inmates brought to the Jail on writs are housed on the third and fourth floors and not allowed to leave their rooms. [Doc. 54-3 at 71]. Moreover, Plaintiff believed that he was not allowed to file the instant lawsuit while the "malicious conduct by a prisoner" charge was pending against him. It got dismissed on May 3, 2024. [Id. at 72, 85]. Plaintiff purported to file a grievance regarding the allegations in this case with the NCDAC on August 2, 2024, while he was incarcerated at the Tabor Correctional Institution. [Id. at 77]. He sent copies of this grievance to Jamie Keever, the Major in charge of the Jail, and Chuck Vines with the State Bureau of Investigation. [Id. at 80-81, 97]. Major Keever did not respond to Plaintiff's grievance. [Id. at 105]. Plaintiff testified that he did not request to file a written grievance or file the grievance at the Jail because inmates can only submit grievances on the kiosk when allowed out of their cells during free time. [Id. at 81, 88-89]. Plaintiff testified that he "d[id]n't know" if he had free time at the Jail after August 22, 2021, during which time he could have submitted a grievance. [Id. at 90].

Plaintiff testified that sick calls are also only done on the Jail kiosk and admitted that he was able to submit a sick call request after an alleged, unrelated incident on September 23, 2021, before he was released on bond.

14

[Id. at 82-84]. Plaintiff also admitted that he successfully submitted a grievance regarding this incident, presumably before he was released on bond on September 28, 2021, [Id. at 108-110], but no documents supporting such filing are before the Court.

## IV. DISCUSSION

### A. Exhaustion

The PLRA requires a prisoner to exhaust his administrative remedies before filing a section 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. The PLRA's exhaustion requirement applies to all inmate suits about prison life. Porter v. Nussle, 534 U.S. 516, 532 (2002). There is "no question that exhaustion is mandatory under PLRA and that unexhausted claims cannot be brought in court." Jones v. Bock, 549 U.S. 199, 211 (2007) (citing Porter, 534 U.S. at 524). The PLRA requires "proper" exhaustion, which means "using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Woodford v. Ngo, 548 U.S. 81, 90 (2006) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir.

2002)).

An inmate, however, is not required to affirmatively show exhaustion in his complaint.  See Bock, 549 U.S. at 216.  "Rather, failure-to-exhaust is an affirmative defense that must be raised by the defendant."  Wilcox v. Brown, 877 F.3d 161, 167 (4th Cir. 2017) (citing Jones, 549 U.S. at 216). "[D]espite the fact that failure-to-exhaust is an affirmative defense, a prisoner's complaint may be dismissed for non-exhaustion 'in the rare case where failure to exhaust is apparent from the fact of the complaint.'"  Id. (quoting Anderson v. XYZ Corr. Health Servs., Inc., 407 F.3d 674, 682 (4th Cir. 2005)).

A prisoner, however, need only exhaust those remedies actually available to him.  Ross v. Blake, 578 U.S. 632, 635 (2016).  "Available" means "capable of use for the accomplishment of a purpose" and that which "is accessible or may be obtained."  Id. at 642 (internal quotation marks and citation omitted).  Exhaustion is excused "if a prisoner, through no fault of his own, was prevented from availing himself of it."  Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008). see Griffin v. Bryant, 56 F.4th 328 (4th Cir. 2022) (setting out when administrative remedies are deemed unavailable).

A prison official has the burden to prove an inmate's failure to exhaust available administrative remedies.  Jones, 549 U.S. at 216.  Once a

16

defendant presents evidence of a failure to exhaust, the burden of proof shifts to the inmate to show, by a preponderance of the evidence, either that exhaustion occurred or that administrative remedies were unavailable. Graham v. Gentry, 413 Fed. App'x 660, 663 (4th Cir. 2011).

Defendants argue that they are entitled to summary judgment because Plaintiff failed to timely and properly submit a grievance to Jail officials regarding the alleged uses of excessive force. [Doc. 47 at 7-12].

The forecast of evidence on this issue shows that the Jail had a grievance procedure that covered the Plaintiff's claims, that grievance forms were available to the Plaintiff even when housed in an isolation cell, that Plaintiff remained in the Jail for over a month after the subject incident and returned numerous times thereafter, and that the Plaintiff filed both a sick call request and a grievance regarding an unrelated incident on September 23, 2021. While Plaintiff claims that he was unable to file a grievance while in an isolation cell and that he was not allowed back into the Jail to file a grievance, the forecast of evidence shows that, during the numerous times he returned to the Jail between November 14, 2021, and August 15, 2023, he was not housed in an isolation cell and admitted that he "[d]idn't know" if he had free time to file a grievance during those times. Moreover, the forecast of evidence shows that Plaintiff mistakenly believed that he had to wait until the

malicious conduct by a prisoner charge was dismissed to file a grievance and proceed with this action.  Furthermore, the forecast of evidence shows that Plaintiff filed an ineffectual grievance regarding the incident with the NCDAC nearly three (3) years after the incident.

From this forecast of evidence, no reasonable jury could conclude that Plaintiff properly exhausted his administrative remedies before filing this action or that he was prevented from exhausting these remedies.  Rather, a reasonable jury would conclude that Plaintiff failed to request and submit a grievance form complaining about the incident at least, in part, due to his mistaken belief that the pending charge prevented him from pursuing this action.

The Court, therefore, will grant Defendants' motion for summary judgment on this ground. Because this dismissal is without prejudice, see Harris v. Midford, No. 1:10-cv-263, 2011 WL 1601446 (W.D.N.C. Apr. 27, 2011), the Court addresses Plaintiff's substantive claims.

## 2.    Excessive Force

Claims of excessive force against a pretrial detainee are governed by the Due Process Clause of the Fourteenth Amendment, which prohibits before conviction the use of excessive force that amounts to punishment. Graham v. Connor, 490 U.S. 386, 394-95 (1989).  To state an excessive force

claim, a pretrial detainee must show only that the force "purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, 576 U.S. 389, 396-97 (2015). The standard for assessing a pretrial detainee's excessive force claim is "solely an objective one." Id. at 397. The calculus of reasonableness includes consideration of "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id. In determining whether the force was objectively unreasonable, a court considers the evidence "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. (citing Graham, 490 U.S. at 396).

Plaintiff claims three distinct uses of excessive force: the use of force by Defendant Steele inside Plaintiff's cell, the use of force by Defendants Boykins, Brandle, Chapman, and Smith, and Deputies Gee, Buitron, and Watkins in the first-floor common room, and the use of force by these same Defendants and Deputies Gee and Buitron after Plaintiff spat at Defendant Boykins. Defendants do not move for summary judgment on the merits of Plaintiff's claim based on the first use of force by Defendant Steele. The

19

Court, therefore, will not further address this claim.

As for the second use of force, the forecast of evidence here shows that Plaintiff was unrestrained, becoming increasingly agitated about wanting to bring charges against Defendant Steele, and screamed obscenities at Defendant Boykins' while simultaneously moving quickly and aggressively toward him. The forecast of evidence further shows that, in response to Plaintiff's aggressive and threatening behavior, Defendant Boykins brought Plaintiff down to the concrete floor, which caused Plaintiff to suffer a broken tooth and a "busted" lip. The forecast of evidence further shows that, while Boykins held Plaintiff against the ground with his arm over Plaintiff's upper back and neck area, Defendants Brandle, Chapman, and Smith, and Deputies Gee, Buitron, and Watkins applied handcuffs to the Plaintiff behind his back. The forecast of evidence further shows that one officer applied his knee against the Plaintiff's right leg while the officers secured the Plaintiff.

From this forecast, no reasonable jury could conclude that the force used by Defendant Boykins in response to the unrestrained Plaintiff's physically and verbally aggressive behavior was objectively unreasonable. Rather, a reasonable jury would conclude that the amount of force used was proportional to the need for the use of force, that Defendant Boykins attempted to and did temper the amount of force used to restore order and

prevent violence, that the security problem posed by Plaintiff was sufficiently serious to warrant the use of force, that Defendant Boykins reasonably perceived the threat posed by Plaintiff, and that no unnecessary force was applied after Plaintiff was brought to the ground. While Plaintiff claims that Defendants Brandle, Chapman, and Smith and Deputies Gee, Buitron, and Watkins "dogpiled" Plaintiff after Defendant Boykins brought him to the ground, the video evidence shows otherwise. While Plaintiff may very well have suffered a broken tooth and injured lip from this use of force, the forecast of evidence shows that the force used was reasonable under the circumstances.

As such, there is no forecast of evidence from which a reasonable jury could conclude that Plaintiff's due process rights were violated during the second use of force.

Because there is no genuine issue for trial as to the second use of force by Defendants Boykins, Brandle, Chapman, and Smith, the Court will grant summary judgment to these Defendants on this claim. Moreover, because the forecast of evidence does not support that a constitutional right was violated as to this use of force, these Defendants would also be protected by qualified immunity. See E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018).

As for the third use of force, the forecast of evidence here shows that, after Plaintiff spat at Defendant Boykins, Defendant Boykins pushed Plaintiff's face away from him and a struggle ensued. For about 10 seconds thereafter, the video footage is obscured. Plaintiff has forecasted evidence that during this time, Defendant Boykins punched him in the head area three times and that the other officers present, including Defendants Brandle, Chapman, and Smith, gratuitously assaulted him. Because the video evidence before the Court does not clearly contradict Plaintiff's version of events, the Court must accept Plaintiff's forecast for the purposes of the present motion. Simmons, 106 F.4th at 385.

From this forecast, a reasonable jury could conclude that the force used to subdue the restrained Plaintiff after he spat at Defendant Boykins was objectively unreasonable. Because there are genuine issues for trial as to the third use of force by Defendants Boykins, Brandle, Chapman, and Smith, the Court will deny summary judgment for these Defendants on this claim.

The Court, therefore, will grant Defendants' motion with prejudice as to Plaintiff's claim based on the second use of force and, as to Plaintiff's other claims, without prejudice based on Plaintiff's failure to exhaust his administrative remedies.

## V. CONCLUSION

For the reasons stated herein, the Court will grant Defendants' motion with prejudice as to Plaintiff's claim against all Defendants based on the second use of force.  As for the remaining claims, the Court will grant Defendants' motion for summary judgment without prejudice for Plaintiff's failure to exhaust his administrative remedies.  Likewise, the counterclaims of Defendants Steele and Boykins are dismissed without prejudice.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 46] is **GRANTED**, Plaintiff's claim regarding the second use of force is **DISMISSED WITH PREJUDICE**, and all other claims are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Defendants Boykins' and Steeles' counterclaims are hereby **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff's "Motion Opposing Defendants Motion for Summary Judgment" [Doc. 54] is construed as Plaintiff's Response to Defendants' Motion for Summary Judgment and the Clerk is respectfully instructed to update the docket accordingly.

The Clerk is instructed to terminate this action.

**IT IS SO ORDERED**.

Signed: March 10, 2026

Martin Reidinger
Chief United States District Judge